# Illinois Official Reports

## Appellate Court

*City of Charleston v. System of Administrative Hearing of the City of Charleston*, **2019 IL App (4th) 180634**

| | |
|---|---|
| Appellate Court Caption | THE CITY OF CHARLESTON, a Municipal Corporation, Plaintiff-Appellant, v. THE SYSTEM OF ADMINISTRATIVE HEARING OF THE CITY OF CHARLESTON, STEVEN C. ENGLUM, and MICHAEL P. KILEY, Administrative Law Judge, Defendants-Appellees. |
| District & No. | Fourth District<br>No. 4-18-0634 |
| Filed | April 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Coles County, No. 18-MR-127; the Hon. James R. Glenn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | W. Britton Isaly, of Ancel, Glink, Diamond, Bush, DiCianni & Krafthefer, P.C., of Chicago, for appellant.<br><br>Chris Wetzel, of The Law Office of Chris Wetzel, LLC, of Charleston, for appellee Steven C. Englum. |

Panel                              JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice Holder White and Justice Harris concurred in the judgment and opinion.

## OPINION

¶ 1    The circuit court of Coles County upheld an administrative decision awarding health insurance benefits to Steven C. Englum pursuant to section 10 of the Public Safety Employee Benefits Act (Act) (820 ILCS 320/10 (West 2008)). The City of Charleston (City) appeals. Because the hearing officer's decision is not against the manifest weight of the evidence, we affirm the judgment.

¶ 2                              I. BACKGROUND

¶ 3    In December 2013, the City enacted an ordinance establishing local administrative procedures to decide claims for health insurance benefits under section 10 of the Act (*id.*). Charleston City Code § 1-11-7 (updated May 1, 2018). (In *Englum v. City of Charleston*, 2017 IL App (4th) 160747, ¶ 68, the appellate court held that the City, a non-home-rule entity, had statutory authority to enact the ordinance.)

¶ 4    Pursuant to the ordinance, Englum petitioned for health insurance benefits. On January 25, 2018, an administrative hearing was held on his petition. The evidence in the hearing tended to show the following.

¶ 5    On December 7, 2008, Englum was a full-time police officer for the City. He was on duty at 12:30 p.m. when the 911 dispatcher radioed him to go to Casey's General Store (Casey's) in Charleston. All the dispatcher said was "3 Lincoln 120, 3 Adam 49 requests an officer to Casey's immediately." Englum recognized "3 Adam 49" as the badge number of Mark Jenkins, who at that time was the City's chief of police. Englum radioed back for more information. The 911 dispatcher, Kathy Pugh, responded that she had no further information—the call to CECOM (Communications-Electronics Command) had been abruptly cut off—but she told Englum she was trying to get back in contact with the caller.

¶ 6    Englum drove to Casey's, parked in the parking lot of a bank so as to be out of sight, and approached the Casey's building cautiously, on foot. Standing outside the building, he peered through a window behind the counter, which afforded him a view of most of the interior of the building. Nothing appeared to be amiss. No one was displaying a gun. No one was lying on the floor. The drawer of the cash register was closed. It looked like business as usual. He entered the building and asked the cashier if everything was all right. She answered in the affirmative. He asked the cashier if she was aware of any reason why the police would have been called; she answered that she knew of no reason. Next, Englum went to the kitchen and spoke with another Casey's employee; she likewise was unaware of any reason why the police would have been called. Out of caution, though, she and Englum searched the building, including the bathrooms; they found nothing of concern.

¶ 7       Using his portable radio, Englum then tried to reach his commanding officer, Sergeant Justin Peterson, at the police station, to find out what was going on. No one answered his radio transmission.

¶ 8       Englum's attorney asked Englum:

"Q. Okay. So[,] at that point in time, what did you decide to do?

A. So[,] at that point in time, when I knew everything was secure at that Casey's location, I advised CECOM I would be changing my location to continue my investigation, that I was going to the Charleston Police Department to speak with Sergeant Peterson in regards to the nature of this call and this investigation.

Q. Okay. So[,] first of all, tell us what your state of mind was at that time, as you were deciding to go back to the Charleston Police Department?

A. Well, again, I—you, obviously, have a heightened concern of what is going on. I mean, you were dispatched to an area; you were advised that your most superior officer, again, asked you to be at a location immediately[,] and you're there[,] and nothing's going on. The dispatch center is advising you they have no more information and they can't get ahold of him. So[,] you know, obviously, back en route to the police department, continuing my investigation, you know, you're wondering, did they mean to send you to Citgo instead of Casey's or, you know, was this the chief of police—our actual chief of police but maybe he was in Mattoon at their Casey's. Or is, you know, someone—do we have some psychopath portraying to be the chief of police and, you know, abuse of the 911 system. You know, I don't know what type of violation of law we have going on, what type of emergency. I don't know where—I mean, we have an investigation to continue.

Q. Okay. So[,] you didn't end that investigation there?

A. Absolutely not.

Q. Personally, from your point of view, would it have been reasonable for you to have done so?

A. I don't think it would have been reasonable for any person to end the investigation there."

¶ 9       Continuing his investigation, Englum drove "very expeditiously" from Casey's to the Charleston police station. On the way to the police station, he did not turn on his emergency lights or siren. When asked why he had not done so, he explained it was a wintry day, there was not a lot of people and traffic, and typically Englum and his fellow police officers used their emergency lights and sirens only in congested areas, to signal people to pull over or stay out of the way. Upon arriving at the police station, Englum pulled into his assigned parking place and got out of the squad car. As he was walking around the back of the squad car to go into the police station, he slipped on ice. He reached out with his left hand, attempting to catch himself, and his hand struck the rear hitch on the squad car as he went down. He suffered injuries to his right shoulder and his left hand in the fall. He picked himself up off the pavement, went into the police station, and told Peterson about the dispatch to Casey's. Peterson knew nothing about it. Because of Englum's injury, Peterson took him off the investigation and assigned another police officer to continue the investigation.

¶ 10      To this day, the dispatch to Casey's remains a mystery. Pugh testified that Jenkins had telephoned CECOM and told her, " ['T]his is Jenkins,['] " and " ['I]I need an officer at

Casey's,['] " or words to that effect. Pugh believed she was able to recognize Jenkins's voice and manner. Not only had the caller identified himself as Jenkins, but, to Pugh, he had sounded like Jenkins. Jenkins testified, however, that he had no recollection of making a 911 call on December 7, 2008—a Sunday, when he would have been off duty. He remembered being called at home that day and being told about Englum's injury, but he did not remember previously calling the dispatcher and telling her to send a police officer to Casey's.

¶ 11 The City's attorney asked Jenkins: "Is there any significance to you about a call that would have been made to CECOM on or about that time of year, December 2008, requesting an officer to go to Casey's General Store?" Jenkins answered: "I have speculation." The City's attorney invited Jenkins to divulge his speculation. Englum's attorney objected. The hearing officer sustained the objection but allowed the City's attorney to rephrase the question. The City's attorney then asked Jenkins about the Shop with a Cop program. Jenkins testified it was a Christmas program in which police officers used cash donations from the community to take children Christmas shopping and in which local stores donated pizza and soda so that the children could have lunch with police officers after the shopping excursions. But Jenkins could not remember if Casey's had participated in the Shop with a Cop program. In any event, he did not remember ever making an emergency call regarding Casey's.

¶ 12 On February 22, 2018, after hearing the foregoing evidence, the hearing officer issued a written decision. The hearing officer began his analysis by stating what Englum had to prove to qualify for health insurance benefits under section 10 of the Act (820 ILCS 320/10 (West 2008)). He had the burden of proving two propositions: (1) while employed as a full-time law enforcement officer, he suffered a catastrophic injury in the line of duty (*id.* § 10(a)) and (2) the injury occurred "as the result of the officer's response to fresh pursuit, the officer['s] *** response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act" (*id.* § 10(b)). Because Englum already had been granted a full line-of-duty disability pension as a result of the injuries he sustained on December 7, 2008, the City conceded the first proposition. Only the second proposition was at issue.

¶ 13 On the basis of the evidence in the administrative hearing, the hearing officer made the following findings as to the second proposition:

"[Englum] responded to what he reasonably believed to be an emergency when he answered the call reportedly initiated by his superior officer to go to Casey's immediately. *** The [h]earing [o]fficer does not believe it significant that [Englum] did not use his lights and siren on his squad car when returning to the police station[,] given [Englum's] explanation at [the] hearing why he did not. The [h]earing [o]fficer also deemed Chief Jenkin[s]'s testimony regarding '[S]hop with a [C]op' was speculation, given the fact he didn't remember making any call and the fact that information was not communicated to [Englum].

While the evidence at the hearing did not amount, in the [h]earing [o]fficer's opinion, to a response to fresh pursuit under Illinois law (see 725 ILCS 5/107-4(3) [(West 2008)]), based on the evidence presented[,] [Englum] could not discount that he reasonably could be investigating an unlawful act perpetrated by another or a possible criminal act."

¶ 14    Accordingly, the hearing officer found that Englum had carried his burden of proof as to both elements of his claim (see *id.* § 10(a), (b)) and that, consequently, he was entitled to health insurance benefits under section 10 of the Act (*id.* § 10).

¶ 15    On March 26, 2018, the City filed a complaint in the circuit court, contesting the administrative decision. Count I of the complaint sought a common law writ of *certiorari*, and, in the alternative, count II sought review under the Administrative Review Act (735 ILCS 5/3-101 *et seq.* (West 2016)).

¶ 16    In an order of August 24, 2018, the circuit court wrote:

"The Court finds that the February 22, 2018[,] [a]dministrative [d]ecision of the [h]earing [o]fficer was not against the manifest weight of the evidence ***. As a basis for its ruling, the [c]ourt finds that Englum responded to what he reasonably believed was an emergency and is therefore entitled to health insurance benefits under the *** Act [(820 ILCS 320/1 *et seq.* (West 2008))]."

¶ 17    This appeal followed.

¶ 18                                        II. ANALYSIS

¶ 19    Subsections (a) and (b) of section 10 of the Act provide as follows:

"(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of 25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support. ***

* * *

(b) In order for the law enforcement, correctional[,] or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10(a), (b) (West 2008).

¶ 20    Apparently, the intended meaning of subsection (b) is as follows:

"(b) In order for the law enforcement, correctional[,] or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, [as the result of] the officer or firefighter's response to what is reasonably believed to be an emergency, [or as the result of] an unlawful act perpetrated by another, or [the injury or death must have occurred] during the investigation of a criminal act." *Id.* § 10(b).

¶ 21    The only dispute in this case is whether subsection (b) was fulfilled. (It is undisputed that on December 7, 2008, Englum suffered "a catastrophic injury *** in the line of duty." *Id.* § 10(a).)

¶ 22    Because subsection (b) is written in the disjunctive (using the conjunction "or"), we need not consider whether the record contains evidence corresponding to each of the alternative phrases in subsection (b). Instead, we will choose one of the phrases, the final phrase, "during the investigation of a criminal act." *Id.* § 10(b). Subsection (b) provides: "In order for the law enforcement *** officer *** to be eligible for insurance coverage under this Act, the injury *** must have occurred *** during the investigation of a criminal act." *Id.*

¶ 23    The City argues that "there were no facts of an unlawful act perpetrated by another or possible criminal act." To evaluate that argument, we first must identify the applicable standard of review (it might be necessary to use more than one standard of review).

¶ 24    In a case seeking a common law writ of *certiorari*, the standards of review are the same as in cases brought under the Administrative Review Law. *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). We review the administrative decision instead of the circuit court's decision (*Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 448 (2010)), and the amount of deference (if any) that we give to the administrative decision depends on the nature of the issue we are addressing (see *American Federation of State, County & Municipal Employees (AFSCME), Council 31 v. Illinois Labor Relations Board, State Panel*, 2014 IL App (1st) 123426, ¶ 35). We defer to an administrative finding of fact unless the finding of fact is "palpably or manifestly against the weight of the evidence." *Superior Coal Co. v. O'Brien*, 383 Ill. 394, 401 (1943). We decide *de novo* any question of law, such as the meaning of a statute. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). If the question is neither purely factual nor purely legal but calls for a mixture of factual and legal determinations—for example, the legal effect of a given set of facts or whether the facts satisfy or violate legal criteria—we look for clear error in the administrative decision. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005). An administrative decision is clearly erroneous if "the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001). If the administrative decision is arguable, we will not be left with the definite and firm conviction that the agency made a mistake.

¶ 25    To decide whether the facts in this case arguably satisfy the statutory condition that "the injury *** occurred *** during the investigation of a criminal act" (820 ILCS 320/10(b) (West 2008)), we first must interpret that statutory condition, a task we will perform *de novo* (see *Cinkus*, 228 Ill. 2d at 211). Specifically, this appeal raises the interpretive question of whether a police officer, applying for health insurance benefits on the theory that "the injury *** occurred *** during the investigation of a criminal act," has to prove the actual commission of a criminal act. 820 ILCS 320/10(b) (West 2008). Does "a criminal act" mean only an actual or objectively established criminal act, or can it also mean a possible criminal act, one that was suspected at the time?

¶ 26    In oral arguments, the City's attorney conceded that "criminal act," in section 10(b), included a "potential" criminal act. On the other hand, Englum's attorney made his own concession in oral arguments. He candidly admitted that, in section 10(b), "an emergency," not "a criminal act," was the subject complement linked to the verbal phrase "reasonably believed to be." *Id.* In other words, he granted that, by the terms of section 10(b), reasonable belief was relevant only to the theory of an "emergency"—as the statute put it, "the injury *** occurred as the result of the officer's response *** to what is reasonably believed to be an emergency." *Id.*

If the theory, by contrast, was that Englum sustained an injury "during the investigation of a criminal act," section 10(b) said nothing about reasonable belief. *Id.*

¶ 27 Englum's interpretation of section 10(b) is grammatically sound. At the same time, however, for two reasons, we agree with the City's concession that "a criminal act," in section 10(b), includes a possible criminal act and that, to recover health insurance benefits on a theory that he or she sustained a catastrophic injury "during the investigation of a criminal act," the police officer need not prove that a criminal act actually was committed. *Id.*

¶ 28 First, "[i]n addition to the statutory language, we also consider the reason for the law, the problems to be remedied, and the objects and purposes sought." *Beelman Trucking v. Illinois Workers' Compensation Comm'n*, 233 Ill. 2d 364, 371 (2009). "The purpose of section 10 of the Act is to continue the provision of employer-sponsored health insurance coverage for public safety employees and the families of public safety employees who are either killed or catastrophically injured in the line of duty." (Internal quotation marks omitted.) *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 20. Much of what police officers do in the line of duty could be described as the investigation of *possible* criminal activity. Often, maybe even most of the time, such investigations fail to yield solid proof of crime—that is, proof solid enough to take to court. Requiring applicants for health insurance benefits under section 10 to prove that the crime they were investigating actually was committed would effectively remove, from the coverage of section 10, a lot of what police officers do in the line of duty. That would be contrary to the legislative intent as stated in *Heelan*.

¶ 29 Second, when interpreting a statute, we give the words of the statute their plain and ordinary meaning, which can be found in a dictionary. *People v. Perry*, 224 Ill. 2d 312, 330 (2007). To "investigate" means to "carry out a systematic or formal inquiry to discover and examine the facts of (an incident, allegation, etc.) *so as to establish the truth*." (Emphasis added.) New Oxford American Dictionary 886 (2005). When referring to "the investigation of a criminal act," the legislature must have contemplated that one aspect of the truth the police officer would try to establish, or at least confirm, was whether the suspected crime really had been committed. 820 ILCS 320/10(b) (West 2008). When section 10(b) says "[i]n order for the law enforcement *** officer *** to be eligible for insurance coverage under this Act, the injury *** must have occurred *** during the investigation of a criminal act," it would be reasonable to interpret the word "investigation" as including an inquiry into whether there was in fact "a criminal act." *Id.*

¶ 30 For example, if at night a police officer sees someone climbing into the window of a dark house, the police officer will investigate a burglary, and the investigation will establish, among other things, whether it really is a burglary—by finding out whether the person climbing into the window really is an intruder as opposed to, say, someone who lost his house key or a teenager who is trying to get back into his bedroom without waking his parents. Probably it is a burglary, but the investigation will confirm whether it is. This is the sort of investigation that police officers routinely perform in the line of duty—looking into suspicious circumstances.

¶ 31 In sum, then, "a criminal act," in section 10(b) of the Act, includes a possible criminal act, a possibility that calls for "investigation." *Id.* The hearing officer in this case found that Englum fell and sustained catastrophic injuries while investigating "a possible criminal act." On December 7, 2008, when Englum sustained his injuries, it was a crime to make a false 911 call (720 ILCS 5/26-1(a)(12) (West 2008)), and it also was a crime to impersonate a police officer (*id.* § 32-5.1). Englum testified that from Casey's he went to the police station to

investigate whether "some psychopath [was] portraying [himself as] the chief of police and [was] abus[ing] *** the 911 system." The hearing officer was entitled to believe Englum's testimony to that effect, and it is not our place to reweigh Englum's credibility. See *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 43. The hearing officer did not clearly err by finding Englum to be entitled to health insurance benefits under section 10 on the ground that his "injur[ies] *** occurred *** during the investigation of a criminal act" (820 ILCS 320/10(b) (West 2008)). See *AFM*, 198 Ill. 2d at 395.

¶ 32                                                   III. CONCLUSION
¶ 33          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 34          Affirmed.