# Illinois Official Reports

## Appellate Court

---

### *Talerico v. Village of Clarendon Hills*, 2021 IL App (2d) 200318

---

| | |
|---|---|
| Appellate Court Caption | RICHARD TALERICO, Plaintiff-Appellant, v. THE VILLAGE OF CLARENDON HILLS, Defendant-Appellee. |
| District & No. | Second District<br>No. 2-20-0318 |
| Filed | June 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 18-MR-1718; the Hon. Bonnie M. Wheaton, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Jerome F. Marconi, of Chicago, for appellant.<br><br>Jason A. Guisinger, Anthony G. Becknek, and Caitlyn R. Culbertson, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Presiding Justice Bridges and Justice Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, Richard Talerico, was a law enforcement officer employed by defendant, the Village of Clarendon Hills (defendant or Village). Plaintiff filed a complaint for declaratory judgment against defendant in the circuit court of Du Page County, seeking a ruling that he was entitled to the payment of health insurance benefits pursuant to section 10 of the Public Safety Employee Benefits Act (Act) (820 ILCS 320/10 (West 2014)). Following cross-motions for summary judgment, the trial court entered judgment in favor of defendant and against plaintiff. On appeal, plaintiff argues that he is entitled to the payment of health insurance benefits under the Act because he suffered a "catastrophic injury" and the injury occurred "during the investigation of a criminal act." 820 ILCS 320/10 (West 2014). For the reasons explained herein, we agree. Accordingly, we reverse the judgment of the trial court granting summary judgment for defendant and remand the case to the trial court with directions to enter summary judgment in favor of plaintiff.

¶ 2                                          I. BACKGROUND

¶ 3 Plaintiff was hired by defendant as a full-time, probationary police officer on November 1, 1986, and received his regular appointment on May 1, 1988. On January 11, 2015, plaintiff was dispatched to a home in the Village in response to a report of a home invasion. While carrying evidence-technician equipment, plaintiff slipped on snow and ice located at the rear of his squad car. Plaintiff injured his left shoulder when he stuck out his left arm to brace himself from falling. In September 2016, plaintiff filed an application for line-of-duty disability benefits with the Board of Trustees of the Clarendon Hills Police Pension Fund (Pension Board). A hearing was held before the Pension Board over two dates in March and May 2017. In a written decision issued in August 2017, the Pension Board determined that the incident of January 11, 2015, constituted an "act of duty" under the Illinois Pension Code (see 40 ILCS 5/5-113 (West 2014); *Harroun v. Addison Police Pension Board*, 372 Ill. App. 3d 260, 262 (2007)) inasmuch as plaintiff "was acting in his capacity as [an] evidence technician when injured and was responding to an active crime scene to perform [an] investigation." Accordingly, the Pension Board awarded plaintiff a line-of-duty disability pension for his injury. See 40 ILCS 5/3-114.1 (West 2014).

¶ 4 After being awarded the line-of-duty disability pension, plaintiff contacted defendant by letter to request the payment of health insurance benefits pursuant to the Act (820 ILCS 320/1 *et seq.* (West 2014)). To qualify for health insurance benefits under the Act, a full-time law enforcement officer must "suffer[ ] a catastrophic injury or [be] killed in the line of duty" (820 ILCS 320/10(a) (West 2014)) and the injury or death "must have occurred as the result of the officer's response to fresh pursuit, the officer['s] *** response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act" (820 ILCS 320/10(b) (West 2014)). In his letter to defendant, plaintiff asserted that he was entitled to benefits under the Act because he suffered a catastrophic injury "while in the course of investigating a crime." Defendant denied the request on the basis that plaintiff was not injured under any of the four factors listed in section 10(b) of the Act (820 ILCS 305/10(b) (West 2014)).

¶ 5 Plaintiff subsequently filed a complaint for declaratory judgment against defendant. The parties filed cross-motions for summary judgment. Attached to plaintiff's motion for summary

judgment were copies of the transcripts of the proceedings before the Pension Board and a copy of the Pension Board's decision. Attached to defendant's motion for summary judgment were, *inter alia*, transcripts of deposition testimony from plaintiff and James Shaw, another patrol officer who responded to the home invasion. The documents attached to the parties' cross-motions for summary judgment disclose the following with respect to the circumstances leading to plaintiff's injury.

¶ 6 On January 11, 2015, plaintiff was assigned to the day shift as patrol supervisor and on-duty evidence technician. Sometime between 1 p.m. and 1:30 p.m. that day, plaintiff responded to a call of a home invasion in progress at 358 Reserve Circle in the Village. Shaw also responded to the dispatch, as was the protocol for a felony. Plaintiff and Shaw parked in different locations away from the home, met somewhere "outside the residence," and approached the scene together. Upon their arrival, plaintiff noticed that the front door of the residence appeared to have been forced open. The homeowner related that she was upstairs when she heard a loud noise and a chime that sounds when her door is opened. The homeowner walked to the top of the staircase and saw an unidentified male standing at the foot of the stairs. The subject fled after being seen by the homeowner. The officers moved the homeowner to Shaw's squad car for safety reasons. The officers then conducted a "quick search" of the residence to make sure there were no other offenders in the building.

¶ 7 Plaintiff testified that it took only "a few minutes" to secure the homeowner and search the residence. After the scene was secured, plaintiff directed Shaw to canvass the neighborhood to obtain information about the offender or ascertain his whereabouts. Plaintiff would gather evidence at the scene. Shaw escorted the homeowner back into the home and took her upstairs. Plaintiff testified that, although the scene was secure in that there was no immediate physical threat to anyone, "there was still evidence that needed to be located, evidence that needed to be documented, [and] evidence that needed to be collected." Plaintiff noted, for instance, that there was snow on the ground, so he would need to search for "footprints in the snow." He would also dust for fingerprints and look for "tools that may have been used to pry open the door" or any other evidence "to establish who the perpetrator may be." Plaintiff stated that, if he did not respond "quickly," the evidence would "deteriorate or be destroyed." Plaintiff explained that "snow footprints" could be lost due to melting snow or "snow kicked over the top." Likewise, he stated that any fingerprints that may have been left on any surfaces could be lost if not handled "expeditiously" and that, if a tool is buried in the snow, its evidentiary value could be "ruined."

¶ 8 Plaintiff did not have in his squad car the equipment to process the evidence because the police department has only one set of such equipment and it is for the use of all the police department's evidence technicians. Accordingly, plaintiff went to the police station to retrieve the equipment needed to process the crime scene. Shaw remained at the scene to wait with the homeowner. At some point, however, Shaw left the homeowner to canvass the neighborhood as plaintiff had directed.

¶ 9 Plaintiff estimated that he was at the crime scene for about 10 minutes before getting into his squad car to return to the police station. Plaintiff drove "normally" to the police station and did not use the lights or sirens on his squad car. At the police station, plaintiff retrieved a camera, a fingerprint-dusting kit, and a kit for packaging and marking evidence. Each of these items was kept in a separate bag. Plaintiff placed all three bags in his squad car. The camera bag was placed either on the passenger seat beside him or on the rear driver's side seat. The

other two bags were placed on the back seat. Plaintiff testified that it did not take him more than 15 minutes to drive to the police station, retrieve the equipment, and return to the scene.

¶ 10    When plaintiff arrived back at the scene, he parked on the street in front of the residence. Plaintiff parked in this location because, unlike when he first arrived, the scene was secure from any offender. Nevertheless, plaintiff still had his "eyes open" because the subject was still at large. After parking, plaintiff picked up the camera bag and exited the squad car. Plaintiff then walked to the rear of the vehicle to get the rest of his equipment from the back seat. While carrying the camera bag, plaintiff slipped on snow and ice. As plaintiff was falling, he "stuck [his] left arm out, caught the back of the vehicle with it to break [his] fall and it shoved [his] arm and everything back up into [his] shoulder." Plaintiff immediately felt a sharp pain in his left arm, and the arm went numb. Plaintiff took some time to regain his composure and allow the pain to subside. Despite the pain, plaintiff retrieved the rest of the equipment from the squad car and spent the next 30 to 45 minutes processing the crime scene. At some point, a third officer, Zach Finfrock, showed up to assist plaintiff and Shaw. Once plaintiff finished processing the crime scene, he returned to the police station and notified his supervisor of the injury.

¶ 11    Plaintiff acknowledged that the crime scene had been left unattended for a time while he went to retrieve the evidence-technician equipment and Shaw canvassed the area. He stated, however, that canvassing the area was a priority because there was a description of the offender and the situation had to be handled "expeditiously." He explained that tracking the suspect was possible if the officers could obtain information from other potential witnesses. Plaintiff also noted that there were two tasks that needed to be done "immediately" and, at the time, there were only two officers to do them. Moreover, plaintiff opined that permitting the homeowner back in the house did not interfere with his ability to gather evidence at the scene because the homeowner was secured away from the items the police knew they had to process in the building.

¶ 12    Plaintiff also acknowledged that, after he and Shaw secured the area, all that was left to do at the scene was to collect evidence, which, while a "top priority," was not an emergency "[b]ecause we're not trying to preserve a life." Plaintiff further admitted that he was not injured as a result of "an unlawful act perpetrated by another" and that, after the scene was secured, he and Shaw were "no longer in any sort of hot-pursuit situation." According to plaintiff, however, he was "processing a crime scene" or "continuing the investigation of a criminal act" at the time of his injury. While plaintiff had not taken any photographs prior to his fall, he was "setting up all [his] equipment," which is "part of the investigation process" because he "can't do anything without having everything set up properly to do it." Plaintiff explained:

> "I was investigating a criminal act—something that someone had done and I was investigating that, establishing the facts of what happened, looking for evidence as to what happened.
>
> And that was my job, at that point in time, as the crime scene investigator—to locate, find, document and collect all possible evidence documenting what happened then."

Plaintiff agreed that, at some point, the initial investigation of a criminal act ceases. In plaintiff's opinion, this would have occurred once he had "finished documenting everything, collecting everything, packaging everything, secured it in [his] vehicle so [he] could transport it out of there, at that point that would have ended the investigation." Plaintiff stated that until

that point "it was an active investigation of items that had to be secured and documented." Plaintiff stated that, absent a timely investigation, evidence such as footprints, fingerprints, or tools used in the commission of the offense could have been lost or deteriorated to the point that they would have been rendered useless.

¶ 13    Shaw agreed that, at the time that plaintiff left the scene to obtain his evidence-technician equipment, there was no longer an emergency. However, he also stated that it remained a "police matter" because the crime scene "needed to be processed." Shaw further testified that a third officer, Finfrock, responded to the scene and helped him canvass the neighborhood. Although he could not recall with certainty, Shaw did not believe that he would have left the scene or the homeowner alone until another officer was there to guard the scene or sit with the homeowner. As a result, he and Finfrock would have canvassed the neighborhood after plaintiff returned to begin collecting evidence.

¶ 14    On May 15, 2020, the trial court entered an order granting summary judgment in favor of defendant and against plaintiff. In so ruling, the court reasoned as follows:

> "The Illinois Supreme Court, in *Gaffney v. Bd. of Trustees of Orland Fire Prot. Dist.*, 2012 IL 110012, construed [the Act] in a case that was factually relevant. The Court found in essence that recovery under [section 10(b) of the Act] was limited to injuries sustained in an emergency situation, declaring that an 'emergency' under the Act occurs when the incident 'is urgent and calls for immediate action'.
>
> In the case before the Court, the injury was sustained by Plaintiff after he determined that the crime scene was secure and after he had left the scene and returned with his investigative equipment. At the time of the injury, the Plaintiff was not involved in a situation that was urgent or called for immediate action. As a matter of law, Plaintiff is not entitled to medical insurance coverage for himself and his family under [the Act]."

On June 8, 2020, plaintiff filed a timely notice of appeal from the trial court's ruling.

¶ 15                                    II. ANALYSIS

¶ 16    On appeal, plaintiff challenges the trial court's decision to grant summary judgment in favor of defendant and against him. According to plaintiff, he is entitled to health insurance benefits under section 10 of the Act (820 ILCS 320/10 (West 2014)) because (1) he suffered a "catastrophic injury" and (2) the injury occurred "during the investigation of a criminal act." Plaintiff further asserts that, in granting summary judgment in defendant's favor, the trial court mistakenly applied the wrong factor from section 10(b) and never addressed plaintiff's claim that his injury occurred during the investigation of a crime. In its response, defendant does not contest that plaintiff suffered a "catastrophic injury" for purposes of section 10 of the Act. Defendant insists, however, that the trial court properly granted its motion for summary judgment because plaintiff did not satisfy the second precondition for an award of benefits under the statute. In defendant's view, plaintiff's injury did not occur "during the investigation of a criminal act" because plaintiff was not actively conducting any investigative tasks or duties when he was injured. Defendant further posits that the trial court correctly decided the case because of the "judicial gloss" on section 10 of the Act supplied by the supreme court in *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012.

- 5 -

¶ 17                                              A. Standard of Review

¶ 18        "The purpose of a summary judgment proceeding is not to try an issue of fact, but rather to determine whether one exists." *Mydlach v. DaimlerChrysler Corp.*, 226 Ill. 2d 307, 311 (2007). Summary judgment is appropriate when the pleadings, depositions, and admissions on file, along with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014); *Gaffney*, 2012 IL 110012, ¶ 73; *O'Laughlin v. Village of River Forest*, 338 Ill. App. 3d 189, 191 (2003). By filing cross-motions for summary judgment, the parties agree that no factual issues exist and the case turns solely on legal issues. *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20; *Gaffney*, 2012 IL 110012, ¶ 73. We note, however, that "the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Because of its drastic nature, summary judgment should be granted only when the movant's right to judgment is clear and free from doubt. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. In appeals from orders granting summary judgment, our review is *de novo. O'Laughlin*, 338 Ill. App. 3d at 191.

¶ 19                                              B. Statute

¶ 20        The issue in this case involves section 10 of the Act (820 ILCS 320/10 (West 2014)). The purpose of section 10 is to continue the provision of employer-sponsored health insurance coverage for a public safety employee and his or her family when the employee is catastrophically injured or killed in the line of duty. *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 20; *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 16; *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 16; *Phalin v. McHenry County Sheriff's Department*, 381 Ill. App. 3d 185, 189 (2008). Section 10 of the Act provides in relevant part as follows:

    "(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of 25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support. ***

                                              * * *

    (b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." 820 ILCS 320/10 (West 2014).

Thus, section 10 of the Act imposes two preconditions for the award of health insurance benefits to a public safety employee. First, section 10(a) of the Act provides that health

insurance benefits are available if the employee "suffers a catastrophic injury or is killed in the line of duty." 820 ILCS 320/10(a) (West 2014); *Springborn v. Village of Sugar Grove*, 2013 IL App (2d) 120861, ¶ 25; *Richter*, 2011 IL App (2d) 100114, ¶ 16. Second, section 10(b) of the Act provides that the injury or death must have occurred under one of the four factors specified in that subsection. 820 ILCS 320/10(b) (West 2014); *Springborn*, 2013 IL App (2d) 120861, ¶ 25; *Richter*, 2011 IL App (2d) 100114, ¶ 16.

¶ 21    As set forth above, plaintiff asserts that he is entitled to health insurance benefits because (1) under section 10(a) of the Act, he suffered a "catastrophic injury" and (2) under section 10(b) of the Act, the injury occurred "during the investigation of a criminal act." Observing that plaintiff was awarded a line-of-duty disability pension for his injury, defendant does not contest that plaintiff suffered a "catastrophic injury" within the meaning of section 10(a). See *Village of Vernon Hills*, 2015 IL 118170, ¶ 25 (holding that, where a line-of-duty disability pension has been awarded, a public safety employee has suffered a "catastrophic injury" within the meaning of section 10(a) as a matter of law and there is no need to engage in discovery or present evidence regarding the employee's injury); *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 400 (2003) (holding that under section 10(a) of the Act, the phrase "catastrophic injury" is synonymous with an injury resulting in a line-of-duty disability pension); *Senese v. Village of Buffalo Grove*, 383 Ill. App. 3d 276, 278 (2008) ("The term 'catastrophic injury' has been construed to mean an injury entitling a police officer or firefighter to receive a line-of-duty disability pension."). However, defendant does dispute whether plaintiff's injury occurred "during the investigation of a criminal act" within the meaning of section 10(b). We turn to that issue now, first addressing plaintiff's claim that, in granting summary judgment in defendant's favor, the trial court mistakenly applied the wrong factor from section 10(b).

¶ 22                              C. Trial Court's Rationale

¶ 23    Plaintiff argues that the trial court mistakenly applied the wrong factor from section 10(b) in granting summary judgment in favor of defendant and against him. According to plaintiff, he never proceeded on the theory that his injury occurred as a result of his response to what he reasonably believed was an emergency. See 820 ILCS 320/10(b) (West 2014) (listing the four factors under which injury or death must result for a public safety employee to qualify for benefits under the Act). Yet, the trial court appeared to rely exclusively on this factor in granting defendant's motion for summary judgment, holding that, at the time of his injury, plaintiff "was not involved in a situation that was urgent or called for immediate action." Plaintiff further asserts that the trial court never referenced his argument that he was entitled to benefits under section 10(b) of the Act because his injury occurred during the investigation of a crime. Defendant responds that plaintiff's position "ignores the judicial gloss" that our supreme court gave to section 10 of the Act in *Gaffney*, 2012 IL 110012.

¶ 24    Throughout this litigation, plaintiff has consistently asserted that the sole basis on which he was entitled to benefits under section 10(b) of the Act was that his injury occurred "during the investigation of a criminal act." Plaintiff advanced this theory in his letter to defendant requesting benefits under the Act, in his complaint for declaratory judgment, and in his cross-motion for summary judgment. Nevertheless, nowhere in its ruling does the trial court reference plaintiff's argument that he was entitled to benefits under section 10(b) because he was injured "during the investigation of a criminal act." Instead, the trial court, invoking *Gaffney*, determined that recovery under section 10(b) is "limited to injuries sustained in an

emergency situation" and that, at the time of his injury, plaintiff was not involved in a situation that was "urgent and called for immediate action." The trial court's reliance on *Gaffney* is grossly misplaced. Significantly, *Gaffney* did not construe the during-the-investigation-of-a-criminal-act factor at issue here. Rather, *Gaffney* addressed whether the public safety employees at issue were injured in "response to what is reasonably believed to be an emergency," a wholly separate factor. *Gaffney*, 2012 IL 110012, ¶ 55 ("[T]he issue is whether the facts alleged by Gaffney show his injury occurred in 'response to what is reasonably believed to be an emergency,' within the meaning of [section 10(b)].""). Moreover, contrary to the finding of the trial court, our review of *Gaffney* does not reveal any language in that case that can reasonably be construed as suggesting that recovery under *every* factor in section 10(b) is "limited to injuries sustained in an emergency situation."

¶ 25        Defendant's claim that the trial court correctly decided the case given "the judicial gloss" on section 10 of the Act supplied by the supreme court in *Gaffney* is simply inaccurate. Defendant observes that the supreme court stated that the four factors in section 10(b) "involve potentially dangerous situations occurring in the course of employment" (*Gaffney*, 2012 IL 110012, ¶ 63) and that "[a] firefighter's employment includes responding to situations involving imminent danger to a person or property" (*Gaffney*, 2012 IL 110012, ¶ 63). According to defendant, therefore, plaintiff "must necessarily have been in a potentially dangerous situation or in a situation involving imminent danger to a person or property at the time of his injury." We reiterate, however, that neither these statements nor any other language from *Gaffney* convey the notion that recovery under *every* factor in section 10(b) is "limited to injuries sustained in an emergency situation." Moreover, the *potential* for danger arguably existed at the time of plaintiff's injury, given that he was responding to an active crime scene and the suspect remained at large.

¶ 26        In short, we agree with plaintiff that the trial court's analysis misses the mark. Despite the trial court's failure to address the section 10(b) factor advanced by plaintiff, we note that it is our obligation to review the result reached by the trial court, not its reasoning. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 48. Accordingly, we turn to plaintiff's claim that he is entitled to health insurance benefits under the Act because he was injured "during the investigation of a criminal act," thereby satisfying one of the factors for such an award under section 10(b).

¶ 27                          D. Section 10(b) of the Act

¶ 28        The Act does not define the term "during the investigation of a criminal act." Plaintiff notes, however, that the phrase was recently construed by the court in *City of Charleston v. System of Administrative Hearing of the City of Charleston*, 2019 IL App (4th) 180634. In that case, a 911 dispatcher radioed Officer Steven Englum and told him that the chief of police wanted an officer to report to a local convenience store " 'immediately.' " *City of Charleston*, 2019 IL App (4th) 180634, ¶ 5. The nature of the call was otherwise unknown because the individual who called 911 had been abruptly cut off. Upon arriving at the convenience store, Englum performed a visual inspection of the premises and spoke to the store's employees. Englum determined that there was nothing amiss at the store. Englum then radioed his commanding officer, but no one answered the transmission. Englum testified that it would not have been reasonable to end his investigation at that point. He explained that he had " 'a heightened concern' " because he was dispatched " 'immediately' " to the area by his " 'most

superior officer,' " but nothing was " 'going on.' " *City of Charleston*, 2019 IL App (4th) 180634, ¶ 8. Englum was trying to determine if the chief of police requested assistance at the convenience store or if someone was impersonating the chief. Accordingly, Englum drove " 'very expeditiously' " from the convenience store to the police station to speak with his commanding officer about " 'the nature of this call and this investigation.' " *City of Charleston*, 2019 IL App (4th) 180634, ¶¶ 8-9. Englum did not turn on his emergency lights or siren on the way to the police station. Upon arriving at the police station, Englum pulled into his assigned parking spot and exited the vehicle. As he was walking around the back of the squad car to enter the police station, Englum slipped on ice, injuring his right shoulder and left hand. Englum picked himself up from the pavement, went into the police station, and told his commanding officer about the dispatch to the convenience store. The commanding officer knew nothing about it. Because of Englum's injury, he was removed from the case and another officer was assigned to the investigation in his stead. *City of Charleston*, 2019 IL App (4th 180634, ¶ 9.

¶ 29  As a result of his injuries, Englum was awarded a line-of-duty disability pension. Thereafter, he petitioned for health insurance benefits under section 10 of the Act. Pursuant to a city ordinance, an administrative hearing was held on Englum's request for section 10 benefits. After considering the evidence presented, the hearing officer issued a written decision awarding Englum benefits. The City of Charleston filed a complaint in the circuit court, contesting the administrative decision. On judicial review, the circuit court affirmed the hearing officer's decision, and the City of Charleston appealed.

¶ 30  On appeal, the reviewing court addressed whether Englum was injured "during the investigation of a criminal act" within the meaning of subsection 10(b). *City of Charleston*, 2019 IL App (4th) 180634, ¶¶ 22-31. In particular, the court phrased the issue as "whether a police officer, applying for health insurance benefits on the theory that 'the injury *** occurred *** during the investigation of a criminal act,' has to prove the actual commission of a criminal act." *City of Charleston*, 2019 IL App (4th) 180634, ¶ 25 (quoting 820 ILCS 320/10(b) (West 2008)). In answering this inquiry, the court recognized that much of what a law enforcement officer does in the line of duty involves the investigation of *possible* criminal activity. *City of Charleston*, 2019 IL App (4th) 180634, ¶ 28. The court stated that requiring an officer seeking benefits under section 10 of the Act to prove that a crime that he or she was investigating actually was committed would remove from the statute's coverage a lot of what police officers do in the line of duty. *City of Charleston*, 2019 IL App (4th) 180634, ¶ 28. In addition, the court observed that the word "investigate" is commonly defined as to " 'carry out a systematic or formal inquiry to discover and examine the facts of (an incident, allegation, etc.) *so as to establish the truth*.' " (Emphasis in original.) *City of Charleston*, 2019 IL App (4th) 180634, ¶ 29 (quoting New Oxford American Dictionary 886 (2005)). Given this definition, the court concluded that the legislature "must have contemplated that one aspect of the truth the police officer would try to establish, or at least confirm, was whether the suspected crime really had been committed." *City of Charleston*, 2019 IL App (4th) 180634, ¶ 29. Accordingly, the court held that "a criminal act" in section 10(b) includes "a possible criminal act, a possibility that calls for 'investigation.' " *City of Charleston*, 2019 IL App (4th) 180634, ¶ 31. The court therefore affirmed the award of section 10 benefits to Englum. *City of Charleston*, 2019 IL App (4th) 180634, ¶ 31.

¶ 31 We find *City of Charleston* to be of limited guidance here, as the court's analysis in that case centered on a different aspect of the phrase "during the investigation of a criminal act." As noted, the issue addressed by the court in *City of Charleston* was "whether a police officer, applying for health insurance benefits on the theory that 'the injury *** occurred *** during the investigation of a criminal act,' has to prove the actual commission of a criminal act." *City of Charleston*, 2019 IL App (4th) 180634, ¶ 25. Here, the parties' dispute does not center on the "criminal act" aspect of the phrase. Indeed, the parties do not disagree that plaintiff was dispatched in response to a report of a criminal act in progress. Rather, the parties focus on the first three words of the phrase, that is, whether plaintiff was inured "*during the investigation of a criminal act*" within the meaning of section 10(b).

¶ 32 Plaintiff asserts that he was injured "during the investigation of a criminal act" because the sole reason he returned to the residence "was to investigate the circumstances of the alleged crime using his skills and the tools of an evidence technician." Thus, plaintiff reasons, his injury occurred while he "was performing the 'systematic or formal inquiry to discover and examine the facts' of an incident by the collection of fingerprints and photographing the incriminating evidence within a home." Defendant disagrees, arguing that plaintiff's injury did not occur "during the investigation of a criminal act" because plaintiff was not actively conducting any investigative tasks or duties when he was injured.

¶ 33 Since the legislature did not define the phrase at issue in the statute, we turn to the rules of statutory construction to ascertain its meaning. The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Nowak*, 2011 IL 111838, ¶ 11; *Krohe*, 204 Ill. 2d at 394-95. The best indicator of legislative intent is the statutory language given its plain and ordinary meaning. *Krohe*, 204 Ill. 2d at 395. Where the language of the statute is clear and unambiguous, a court must apply the statute without resort to any aids of statutory construction. *Krohe*, 204 Ill. 2d at 395. If the statutory language is ambiguous, however, a court may look to extrinsic sources, including legislative history, to ascertain the legislature's intent. *Krohe*, 204 Ill. 2d at 395. A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways. *Krohe*, 204 Ill. 2d at 395-96. The construction of a statute is a question of law subject to *de novo* review. *Nowak*, 2011 IL 111838, ¶ 11.

¶ 34 As noted previously, although the legislature made the application of section 10(b) contingent upon the injury occurring under one of the four enumerated factors, including "during the investigation of a criminal act," the Act nowhere defines what any of the terms in that phrase mean. However, we may consult the dictionary for guidance in determining the meaning of a term. *Gaffney*, 2012 IL 110012, ¶ 60; *Senese*, 383 Ill. App. 3d at 279. The primary definition of the word "during" from Webster's Third New International Dictionary is "throughout the continuance or course of." Webster's Third New International Dictionary 703 (2002). "Investigation" has been defined as

> "[t]he activity of trying to find out the truth about something, such as a crime, accident, or historical issue; esp., either an authoritative inquiry into certain facts, as by a legislative committee, or a systematic examination of some intellectual problem or empirical question, as by mathematical treatment or use of the scientific method." Black's Law Dictionary (11th ed. 2019).

The term "criminal act" has been defined as "[an] unlawful act that subjects the actor to prosecution under criminal law." Black's Law Dictionary (11th ed. 2019). Given these

definitions, we have no difficulty concluding that plaintiff was injured "*during the investigation* of a criminal act," within the plain meaning of section 10(b) of the Act.

¶ 35        On the day of his injury, plaintiff received a report of a home invasion—a criminal act. See 720 ILCS 5/19-6 (West 2014) (setting forth the elements of "home invasion" and defining the offense as a Class X felony). In response, plaintiff and Shaw, the other responding officer, began the process of trying to find out the truth about the alleged criminal act. To this end, plaintiff and Shaw traveled to the scene and met outside the residence. As plaintiff approached the front door, he noticed that the door appeared to have been forced open. The officers then spoke to the homeowner and conducted a "quick search" of the residence to make sure there were no offenders in the home. Shaw remained on the scene to wait with the homeowner. At some point, Shaw performed a canvass of the area. Plaintiff, as the on-duty evidence technician, went to the police station to retrieve the equipment he would need to process the crime scene and collect evidence in furtherance of the investigation of the criminal act. At the police station, plaintiff retrieved a camera bag, a fingerprint-dusting kit, and a kit for packaging and marking evidence and placed the three items in his squad car. Plaintiff then returned to the scene, parked his vehicle in front of the residence, picked up the camera bag, and exited his vehicle. As plaintiff walked to the back of the vehicle to get the rest of his equipment from the back seat, he slipped on snow and ice and fell. After taking time to regain his composure and allow his pain to subside, plaintiff retrieved the rest of the equipment from the squad car and spent 30 to 45 minutes processing the crime scene. When he completed these tasks, plaintiff returned to the police station. From the moment of his initial dispatch to the crime scene until he left to return to the police station after his injury, plaintiff was clearly involved in a continuous course of conduct intended to gather evidence for the purpose of ascertaining the truth about the crime for which he was dispatched. As such, we conclude that plaintiff was injured "during the investigation of a criminal act" within the plain meaning of section 10(b) of the Act. Therefore, plaintiff was entitled to summary judgment as a matter of law.

¶ 36        Defendant advances various reasons why, in its view, the trial court reached the proper result. We address these claims *seriatim*. Initially, defendant, citing *Nowak*, 2011 IL 111838, ¶ 19, asserts that, because the Act is in derogation of the common law, it is to be strictly construed in defendant's favor, not broadly in plaintiff's favor. In *Nowak*, however, the supreme court invoked this tenet of statutory construction because it found that the Act was ambiguous as to when a municipality's obligation under section 10 attaches—the date on which the public safety employee actually suffers an injury or the date on which the public safety officer is declared permanently disabled and therefore eligible for a line-of-duty disability pension. *Nowak*, 2011 IL 111838, ¶¶ 12-13. As noted above, we find no such ambiguity with respect to the meaning of the phrase "during the investigation of a criminal act." Thus, we decline defendant's invitation to narrow the scope of the phrase using this canon of statutory construction.

¶ 37        Next, defendant asserts that, although plaintiff invokes only the fourth section 10(b) factor in support of his request for health insurance benefits, this specific factor must be read in context with the other three factors. See *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009) ("In determining the plain meaning of statutory terms, we consider the statute in its entirety, the subject it addresses, and the apparent intent of the legislature in enacting it."). Defendant posits that reading all four section 10(b) factors "together, thematically, is the only proper way to read and analyze [the Act]." According to defendant, when one examines the four factors that

entitle a public safety employee to benefits under the Act, "a theme emerges: they all pertain to scenarios where there is an enhanced risk of danger and involve an elevated pretext of unknowns." In support of this position, defendant cites the dissent in *Marquardt v. City of Des Plaines*, 2018 IL App (1st) 163186, ¶ 37 (Mason, J., dissenting). However, a dissent has no precedential value. *People v. Love*, 2013 IL App (2d) 120600, ¶ 42; *People v. Smythe*, 352 Ill. App. 3d 1056, 1061 (2004). More significantly, contrary to defendant's assertion, there is nothing in the plain language of the statute that engrafts an enhanced-risk-of-danger or elevated-pretext-of-unknowns element onto the fourth factor. Indeed, such an interpretation ignores the plain language of the statute. In this regard, the first three factors in section 10(b)— a response to fresh pursuit, a response to what is reasonably believed to be an emergency, and an unlawful act perpetrated by another—are all prefaced with the phrase "as a result of." The fourth factor—the investigation of a criminal act—does not naturally follow the words "as a result of." That is, the legislature did not specify that the injury must occur "*as a result of* the investigation of a criminal act." Rather, the legislature provided that the injury must occur "*during* the investigation of a criminal act." (Emphasis added.) 820 ILCS 320/10(b) (West 2014). Thus, as it is written, the only requirement imposed by the factor of section 10(b) at issue in this case is that the injury occur "during" the investigation of a criminal act. And as we determined previously, from the moment of his initial dispatch to the crime scene until he left to return to the police station after his injury, plaintiff was clearly involved in a continuous course of conduct intended to gather evidence for the purpose of ascertaining the truth about the crime for which he was dispatched. As such, plaintiff was injured "during the investigation of a criminal act" within the plain meaning of section 10(b) of the Act.

¶ 38    Defendant also posits that, to be entitled to benefits under section 10 of the Act, the public safety employee "had to have been performing his or her duties according to a requirement of immediate necessity which led to the injury." In response to this assertion, we point out there was some immediacy to the actions plaintiff was taking at the time of his injury. To this end, plaintiff was investigating a home invasion that occurred while the homeowner was present. The suspect remained at large. At his deposition, plaintiff testified that there was still evidence that needed to be collected and that if he did not act "expeditiously" the evidence could be lost or destroyed. Plaintiff noted, for instance, that there was snow on the ground, so he would need to search for "footprints in the snow." Plaintiff also had to dust for fingerprints and search for tools used in the commission of the offense. Plaintiff stated that, if he did not act "quickly," the footprints in the snow could melt or be otherwise disturbed. Likewise, plaintiff stated that any fingerprints that may have been left on surfaces could be lost if not handled in a prompt manner and that the evidentiary value of other evidence could be "ruined." Thus, we conclude that there was also an element of immediacy attached to plaintiff's investigative duties at the time of his injury.

¶ 39    Next, defendant maintains that plaintiff is not entitled to section 10 benefits because, at the time of his injury, he "was not conducting any investigation or any investigatory acts." In this regard, defendant points out that, at the time of plaintiff's injury, he had not removed the camera from its bag, he had not removed the rest of the evidence-technician equipment from the back seat of the squad car, and he had not taken any photos. According to defendant, plaintiff "had not even stepped back into the role of an evidence technician that may have given rise to a different set of circumstances." Thus, defendant reasons, plaintiff's injury occurred "during an interlude to an investigation and not during the investigation proper." We disagree.

The plain language of section 10(b) does not require a public safety employee to be injured while performing investigatory acts. It requires only that the injury occur "*during* the investigation of a criminal act." And as we determined previously, from the moment of his initial dispatch to the crime scene until he left to return to the police station after his injury, plaintiff was clearly involved in a continuous course of conduct intended to gather evidence for the purpose of ascertaining the truth about the crime for which he was dispatched. Defendant's position therefore lacks merit.

¶ 40    In a related argument, defendant cites *People v. Tsombanidis*, 235 Ill. App. 3d 823, 836 (1992), to suggest that plaintiff was not injured "during the investigation of a criminal act" because he was performing only administrative tasks at the time of his injury. At issue in *Tsombanidis* was whether the business record exception to the hearsay rule applied to an internal Drug Enforcement Agency form (Form 48) authorizing the destruction of evidence. The court held that Form 48 was admissible under the business record exception because it was completed pursuant to regular office practice and not "during an investigation of an alleged offense or during an investigation relating to pending or anticipated litigation." (Internal quotation marks omitted.) *Tsombanidis*, 235 Ill. App. 3d at 836. We find defendant's reliance on *Tsombanidis* misplaced for the simple reason that that case did not involve an analysis of section 10(b) of the Act.

¶ 41    Citing *United States v. Sharpe*, 470 U.S. 675 (1985), defendant next asserts that the investigation had ended prior to plaintiff's fall. *Sharpe* is a criminal case that analyzed a traffic stop under the fourth amendment to the United States Constitution (U.S. Const., amend. IV). Defendant attempts to analogize the "investigatory stop" in *Sharpe* to plaintiff's investigation. Plaintiff argues that the two situations are not remotely similar. We agree with plaintiff. At issue in *Sharpe* was whether a 20-minute detention of a person suspected of transporting marijuana met the fourth amendment's standard of reasonableness. *Sharpe*, 470 U.S. at 683. It was in this context that the United States Supreme Court made the statement that, when an investigatory stop continues indefinitely, it can no longer be justified as an investigatory stop. *Sharpe*, 470 U.S. at 683. *Sharpe* is simply not relevant in determining when plaintiff's criminal investigation formally ended under section 10(b) of the Act.

¶ 42    Defendant nevertheless insists that there must be an end point to the phrase "during the investigation of a criminal act," as investigations can last months, even years. Defendant maintains that such an interpretation of the phrase would be overly expansive. Defendant posits, for instance, that an officer who falls backward in his or her chair within the comfort of the police station and is injured while reading an e-mail pertaining to an ongoing criminal case would be entitled to benefits under the Act. Defendant further posits that the same would be true for an officer who picks up a cold case file in a police station basement and then falls on the stairs. Of course, this presupposes that each of these injuries arose to the level of a "catastrophic injury" under section 10(a) of the Act. This point aside, while we do not disagree with the premise that the initial investigation of a criminal act must cease at some point, we decline to comment any further on the situations described by defendant, as they are not illustrative of the factual scenario before us in this case and defendant was clearly injured "during" the investigation of a criminal act.

¶ 43    Defendant also insists that plaintiff is foreclosed from receiving benefits under section 10 of the Act, based on the definition of "investigate" set forth by the court in *City of Charleston*. As noted above, the *City of Charleston* court stated that the word "investigate" means to

" 'carry out a systematic or formal inquiry to discover and examine the facts of (an incident, allegation, etc.) *so as to establish the truth*.' " (Emphasis in original.) *City of Charleston*, 2019 IL App (4th) 180634, ¶ 29 (quoting New Oxford American Dictionary 886 (2005)). According to defendant, plaintiff's investigation would not fall into this definition because it was neither systematic nor formal in that plaintiff (1) left the scene of the crime to obtain his equipment, (2) ordered Shaw, the only other officer on duty on the scene, to also leave the scene to canvass the neighborhood, (3) pulled up to the front of the scene "with seemingly no regard for footprints that may be in the street from when the perpetrator fled," and (4) permitted the homeowner to pass through the scene to reenter her house.

¶ 44    At the outset, we note that the court in *City of Charleston* used a slightly different definition of "investigate" than the definition of "investigation" we employ here. However, even assessing plaintiff's conduct under the definition used by the court in *City of Charleston*, plaintiff would still be entitled to benefits under section 10 of the Act. Contrary to defendant's position, plaintiff's investigation was systematic and formal. To this end, plaintiff explained that he and Shaw followed the protocol for responding to felonies. Plaintiff stated that the officers parked in different locations away from the home, met somewhere "outside the residence," and approached the scene together. The officers spoke with the homeowner and moved her to safety, after which they conducted a "quick search" of the residence to make sure there were no other offenders in the building. After the scene was secured, Shaw escorted the homeowner back into the home and took her upstairs. Plaintiff went to the police station to retrieve the equipment needed to process the scene. Shaw remained on the scene to wait with the homeowner. Plaintiff returned within 15 minutes, parking in front of the residence. While in the process of retrieving the equipment he needed to process the scene, plaintiff was injured. Once plaintiff's pain subsided, he completed his evidence-technician duties at the scene and returned to the police station. Based on this record, we conclude that the facts contain sufficient indicia to establish that plaintiff's actions constituted a systematic and formal inquiry to discover and examine the facts of the offense so as to fall within the definition of "investigate" as set forth by the court in *City of Charleston*.

¶ 45    In so holding, we are cognizant that plaintiff (1) left the crime scene to obtain his equipment, (2) ordered Shaw to canvass the neighborhood, (3) parked in front of the crime scene, and (4) allowed the homeowner to reenter her home. However, these facts do not render the investigation unsystematic and informal. Indeed, reasonable explanations were offered for each of these acts. Plaintiff had to leave the crime scene to obtain the equipment because the only set the police department had was housed at the police station. Plaintiff testified that canvassing the area was a priority because there was a description of the offender and the situation had to be handled expeditiously. Moreover, Shaw testified that it would have been unlikely that he would have left the scene or the homeowner until another officer was there to guard the scene or sit with the homeowner. Additionally, there was no evidence that plaintiff, by parking in front of the crime scene, disturbed any evidence. Finally, plaintiff testified that permitting the homeowner back in the house did not interfere with his ability to gather evidence at the scene because the homeowner was secured away from the items the police knew they had to process in the home.

## III. CONCLUSION

In short, plaintiff was entitled to the payment of health insurance benefits by defendant pursuant to the plain language of section 10 of the Act (820 ILCS 320/10 (West 2014)) because he suffered a "catastrophic injury" and the injury occurred "during the investigation of a criminal act." Accordingly, we reverse the judgment of the circuit court of Du Page County granting summary judgment in favor of defendant and remand the case to the trial court with directions to enter summary judgment in favor of plaintiff.

Reversed and remanded with directions.